**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FRANK PADRO, | |
| Plaintiff, | Civil Action No. 15-7096 (MAS) (DEA) |
| v. | **OPINION** |
| DR. AHMAR SHAKIR, et al., | |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court on the Motions for Summary Judgment filed in this prisoner civil rights matter by Defendants[1] Anne Peregmon (ECF Nos. 116-17), Dr. Ahmar Shakir (ECF No. 118), and Dr. Scott Miller (ECF No. 119). Plaintiff filed an omnibus brief in opposition to all three Motions (ECF Nos. 123-25), to which the Defendants replied. (ECF Nos. 130, 132, 134, 136.) For the following reasons, Defendants' Motions are granted and judgment shall be

---

[1] An additional Defendant, Alejandrina Sumicad, was named and served in this matter, but did not file any responsive pleading. (*See* ECF Nos. 1, 13, 21.) At Plaintiff's request, the Clerk entered an entry of default as to Defendant Sumicad in February 2016. (*See* ECF Docket Sheet.) Although Plaintiff filed a motion seeking a default judgment against her while acting *pro se* in March 2016, that motion was terminated by this Court in March 2016 while this matter was briefly stayed. (*See* ECF Nos. 28, 32.) Plaintiff has yet to file a new motion seeking default judgment or reassert his previously filed default judgment motion since this matter was reopened. To the extent that Plaintiff wishes to pursue a default judgment motion against Defendant Sumicad, he should do so by filing a new motion within thirty days. In any event, as Ms. Sumicad has not sought to defend herself in this matter, and as she is not involved of any of the motions discussed in this opinion, this Court refers only to the three moving Defendants when using the term "Defendants" throughout this opinion.

entered in favor of the moving Defendants on Plaintiff's Eighth Amendment medical claims, and

in favor of Defendant Peregmon as to Plaintiff's intentional infliction of emotional distress claim.

## I.   **BACKGROUND**

Plaintiff Frank Padro is a state prisoner currently serving a life sentence arising out of

armed robbery charges.  (ECF No. 123-1 at 9.)  While incarcerated at New Jersey State Prison in

June 2014, he slipped in the shower and reinjured his right knee.  (ECF No. 118-1 at 2.)  Following

initial treatment and an MRI which revealed knee injuries including significant degenerative

arthritis and a torn meniscus, Plaintiff underwent arthroscopic knee surgery on December 3, 2014,

performed by Defendant Dr. Ahmar Shakir.[2]  (*Id.*; ECF No. 118-3 at 3.)  According to surgical

records, Plaintiff was specifically told by Dr. Shakir that this surgery carried a risk of infection.

(ECF No. 8 at 35.)  During that surgery, Dr. Shakir performed repairs to Plaintiff's torn meniscus

and removed various pieces of cartilage and bone tissue which were contributing to Plaintiff's

injuries.  (*Id.* at 35-36.)  Following surgery, Dr. Shakir noted that Plaintiff suffered from an

advanced stage of degenerative arthritis and was a "candidate for total knee replacement . . . when

appropriate" due to the severity of the degeneration of the joint.  (*Id.* at 36.)

Petitioner's recovery from surgery progressed until December 13, 2014.  (ECF No. 118-5

at 2.)  At that time, Plaintiff woke "with swelling, increased pain, and bruising to the right knee."

(*Id.*)  During an examination on December 15, 2014, prison medical personnel noted that Plaintiff's

knee had "mild warmth and moderate swelling," and Plaintiff was provided with an antibiotic.

(ECF No. 117-12 at 5.)  Following diagnostic testing which revealed an elevated white blood cell

---

[2] Although it appears that all of the parties have access to Plaintiff's complete medical records and that each party's medical expert had an opportunity to review those records in preparing their reports, the parties have not provided a complete copy of Plaintiff's prison and hospital records for the time period in question in this matter.  This Court thus makes use of the summaries of those records contained in the various expert reports which are in large part consistent with one another to reconstruct the course of Plaintiff's treatment following his December 2014 surgery.

count, Plaintiff was taken to St. Francis Medical Center on December 17, 2014. (ECF No. 118-5 at 2.) After discussing the matter with Dr. Shakir over the phone, the treating physician at the hospital started Plaintiff on antibiotics including Bactrim. (*Id.*) At the time of this hospital visit, Plaintiff did not have a fever. (ECF No. 117-12 at 5.) An x-ray taken during this visit indicated that Plaintiff had "moderately severe osteoarthritic changes of the right knee" and a small amount of liquid in the joint. (*Id.*)

Following his return to the prison, Plaintiff was seen by Dr. Shakir on December 18. (ECF No. 117-11 at 3.) During this visit, Dr. Shakir aspirated a small amount of "blood and brown pus" from the knee. (*Id.*) Dr. Shakir recommended that the prison "continue [to provide Plaintiff with] Bactrim."[3] (*Id.*) Plaintiff was seen for a follow-up appointment by the prison's nurse practitioner, Alejandrina Sumicad, on December 29, 2014. (*Id.*; *see also* ECF No. 117-12 at 6.) At that time, Plaintiff did not have a fever, but his knee was swollen and warm. (ECF No. 117-11 at 3; ECF No. 117-12 at 6.) Plaintiff was recommended to continue taking Bactrim. (ECF No. 117-11 at 3.)

On January 2, 2015, Plaintiff saw Dr. Miller for a follow-up orthopedic consultation. (*Id.* at 3-4.) Dr. Miller examined Plaintiff, found no sign of fever, and noted that Plaintiff's knee was cool and lacked either effusion (liquid in the joint) or erythema. (*Id.*; ECF No. 119-4 at 7-8.) Based on this evaluation, Dr. Miller concluded that Plaintiff did not have an infection at that time, and offered Plaintiff a cortisone injection to help with pain, which Plaintiff accepted. (ECF No. 119-4 at 7-9.) Plaintiff was thereafter seen by a nurse on January 6, who noted mild swelling, no significant effusion, and mild erythema, and plans were made to provide Plaintiff with crutches. (ECF No. 117-12 at 6; ECF No. 117-11 at 4.)

---

[3] Plaintiff's expert also contends that Dr. Shakir gave Plaintiff a cortisone injection, though the other expert reports do not make mention of such an injection at the mid-December evaluation by Dr. Shakir. (*See* ECF No. 117-5 at 3.)

Plaintiff had several more follow-up visits in January 2015, and was ultimately placed in physical therapy with Defendant Peregmon starting on January 29, 2015. (ECF No. 117-12 at 6; ECF No. 117-11 at 4.) During these visits, Plaintiff complained of a great deal of pain and told Peregmon that he believed he had a leg infection. (ECF No. 8 at 7.) Ms. Peregmon, however, did not perceive Plaintiff to have an infection as she saw no signs of fever, redness, or warmth in the knee joint which she would have expected from an infected joint, and instead believed his swelling and pain were the result of his surgery and arthritis. (ECF No. 117-3 at 2-3.) Ms. Peregmon testified at the deposition that, had she thought Plaintiff had an infection, she would have referred him to prison medical staff for diagnosis and treatment – an act she testified she did on one occasion when she asked a nurse practitioner to examine Plaintiff because he continued to complain of an infection. (ECF No. 117-4 at 2.)

Plaintiff next saw Dr. Shakir on February 26, 2015. (ECF No. 117-12 at 6.) During that visit, Dr. Shakir noted a significant amount of fluid in Plaintiff's knee joint, decreased range of motion, and that Plaintiff was in significant pain. (*Id.*) When aspiration of the knee produced a significant quantity of murky brown fluid, Dr. Shakir suspected Plaintiff's knee had become infected, and recommended he be transported to St. Francis Medical Center. (*Id.*) Following x-rays and blood tests, Plaintiff was diagnosed with a septic knee joint, and underwent surgery to remove the fluid and damaged tissue, which was performed by Dr. Miller on February 27, 2015. (*Id.*) During the surgery, Dr. Miller noted no definite pus or purulent material, but found that the synovium of Plaintiff's knee joint was "quite irritated and erythematous and friable," and that there was "significant bleeding[,] swelling and edema in the soft tissue surrounding the knee." (ECF No. 8 at 37.) Cultures of the fluid extracted from the knee developed into methicillin-sensitive staph aureus ("MSSA") cultures, and Plaintiff was therefore placed on intravenous antibiotics delivered through a PICC line. (*Id.*) Plaintiff was released from the hospital back to the prison

4

infirmary on March 5, 2015, where he continued to receive antibiotics.  (*Id.* at 37-38.)  After eight

weeks, the PICC line was removed as the infection had resolved, and Plaintiff continued to receive

care for his arthritic knee through University Hospital.  (ECF No. 117-5 at 3, 5.)  Plaintiff filed

suit in this matter in September 2015, raising claims in which he essentially asserts that the

Defendants failure to properly diagnose and treat his infected knee amount to deliberate

indifference to his medical needs in violation of the Eighth Amendment.  (ECF No. 1.)

In support of his complaint, Plaintiff has provided the Court with an expert report prepared

by Dr. Cary Skolnick.  (ECF No. 117-5.)  Dr. Skolnick summarized his views of the care Plaintiff

received as follows:

> [Plaintiff] did have an operative arthroscopy with a pre-operative diagnosis of medial meniscus tear proven on MRI.  [He] was told about operative arthroscopy and medial partial meniscectomy.  I do not know if he was also told that there may be an abrasion arthroplasty or microfracture.  These additional procedures are normal additions . . . when appropriate findings are [made.]  I do not believe there was a deviation in standard for performing this operative procedure [in December 2014.]
>
> The patient did not have perioperative antibiotics with regard to his operative arthroscopy which is also within the standard of care and not a deviation.  The patient did have consistent follow-up care but apparently even though an infection had occurred, treating follow-up medical practitioners did not believe there was an infective process.  The cortisone injections [given by Shakir and Miller] would be contraindicated if they believed an infection was happening.  There were no postoperative cultures early on.
>
> Ultimately, they did find the patient did have an infection and then did treat it appropriately with incision and drainage and long-term IV antibiotics followed by [therapy].  The patient did have his infection cured, but does have degenerative arthritis, which he did have pre-existing, but it was augmented by the infection and delayed care.
>
> In any respect, at maximum, the delay in care was approximately 6 weeks.  The patient was seen on a regular basis, there were attempts at arthrocentesis, but fluid was unable to be obtained for culture.

In short, there was a serious medical need for this patient to be treated and he was seen on multiple occasions, and the infection was missed. However, ultimately there was a misdiagnosis and a delay in diagnosis of postoperative infection that did cause the patient to have an increase in the degenerative arthritis.

Ultimately, this patient will require a total knee arthroplasty. The cause for the need for the total knee arthroplasty will be both the patients pre-existing arthritis, as well as augmented by the infection and the delay in diagnosis. The delay in diagnosis caused the patient to have additional pain and suffering for a period of time longer than was necessary. However, an earlier diagnosis would just have made the incision and drainage procedure at an earlier date. I believe, with a reasonable degree of medical certainty, that even if there was no delay in diagnosis, the patient would still need a total knee arthroplasty in the future[.]

(*Id.* at 4-5.)

Defendants also filed a trio of proposed expert reports – one written by Dr. Todd M. Lipschultz, one authored by Dr. Richard Schenk, and one prepared by Dr. Brett C. Gilbert. Dr. Lipschultz, opined as follows:

I am in agreement with the conclusion reached by Dr. Skolnick in that there was no deviation from the standard of care in the knee arthroscopy performed on December []4, 2014. Unfortunately, following that procedure, [Plaintiff] did develop a knee infection. This was identified and treated with antibiotics as well as a subsequent formal arthrotomy with irrigation, debridement, and intravenous antibiotics.

I disagree with the conclusion by Dr. Skolnick that the future need for a total knee arthroplasty "will be both the patient's preexisting arthritis, as well as augmented by the infection and the delay in diagnosis." Dr. Shakir indicated in his operative report from December 4, 2014[,] that [Plaintiff] would require a total knee arthroplasty. He attempted to delay the need for a total knee arthroplasty by performing an abrasion chondroplasty/micro fracture technique on the significantly degenerative areas of the knee. It should be noted that Dr. Skolnick did not indicate that there was any deviation in the standard of care provided to [Plaintiff] by his treating orthopedic surgeons. I am in agreement with this. Within a reasonable degree of medical probability, there is certainly

> not any deliberate indifference to [Plaintiff's] alleged severe medical needs by Dr. Shakir.

(ECF No. 118-2 at 4.)

Dr. Gilbert in turn opined as follows:

> The work-up of [Plaintiff's] possible post op knee infection was appropriate. The patient had appropriate postoperative follow-up both by the nurse practitioner in the Department of Corrections as well as both orthopedic surgeons. He was seen on multiple occasions. When there was concern for possible infection related to either his cope sites and/or cellulitis in mid December [2014], he was given initially Cipro by the prison system followed by an ER visit at Saint Francis and Bactrim, which he took for several weeks, which would have appropriately treated any type of early infection to the scope sites, cellulitis of the surrounding skin, or even the knee joint itself.

> He then was seen by Dr. Miller in early January and at that time, there was no evidence of a septic joint or any other infectious process at that time.

> When someone develops an infected joint, especially the knee, there is intense swelling, pain, absent range of motion, redness, and inability to ambulate. In addition, more often than not there is persistent fever. The patient did not experience any of these signs or symptoms until approximately several days prior to his admission at Saint Francis at the end of February. In fact, he was clinically improving by the notes given as late as February 16, 2015. There were 55 days that passed between his visit on January 2 and his admission on February 26. In addition, steroids were given intra-articularly on the January 2nd visit. If there was an infection at that time the steroids would have accelerated the infectious process. It is more likely than not that if he had a septic knee joint prior to 1 week before his February admission, he would have experienced the signs and symptoms as described above. MSSA is an extremely virulent organism and from onset of infection to presentation is a matter of days not weeks. The operative report on February 27[] does not even support a septic joint. It is more likely than not that the patient's infectious process was caught very early in the disease process that's why synovitis was seen and not a septic knee joint. If there was a delay in care then it would be more likely than not that he would have developed a septic joint and this would have been seen in the OR at the time of the surgery on February 27th.

In addition, the fact that it was a dry tap on entry into the joint further supports that the disease process was in its early stages. In the presence of a septic joint, there would be abundant purulent material in the joint space and when it was aspirated, it would be thick and purulent and easy to obtain.  This was not the operative findings on February 27 at the time of the surgery.

Dr. Shakir and Dr. Miller appropriately evaluated, worked-up, and treated a minor knee infection postoperatively.  The patient would not have been able to undergo physical therapy and rehabilitation for 55 days prior to the diagnosis if the joint was infected earlier.  He likely did develop a mild port site infection vs. hemarthrosis (due to not following non-weight bearing status recommendations leading to blood in the joint space hence Dr. Shakir's findings on his tap in mid-December) but that was successfully treated with drainage and antibiotics.  If that process was the beginning of the development of a septic knee joint it would have occurred in late December.  In fact, I am not even convinced that there was a joint space infection due to the dry tap in the OR as described above and no purulence in the actual joint space.  This was an early infectious process as seen by Dr. Miller at the time of the scope in late February with only an inflammatory synovitis seen.  In addition, there was no delay in diagnosis of any process that occurred from Dec[ember] 4, 2014[,] up until his repeat OR on February 27, 2015.  As previously mentioned he was appropriately diagnosed, treated with the correct antibiotics for the appropriate duration, and there was no evidence of recrudescence of infection thereafter.  Based on the records, the patient had severe degenerative disease in his knee and had multiple recommendations that he would ultimately need a knee replacement in the future regardless of the fact that he developed a mild post op infection.

In conclusion, to a reasonable degree of medical certainty the infectious disease evaluation and treatment of a post-op knee infection by Dr. Shakir and Dr. Miller from Dec[ember] 4, 2014[,] thr[ough] March 5, 2015[,] was appropriate.  Also, within a reasonable degree of medical certainty there was no deliberate indifference by Dr. Miller or Dr. Shakir to Mr. Padro's alleged severe medical needs.

(ECF No. 117-11 at 5-6.)

Finally, Dr. Schenk, following a review of all of the other reports and medical records, opined that

Dr. Skolnick did not find any deviations [from the standard of care with relation to the surgery of 12/2014. But Dr. Skolnick opined that "the cause for the need of the total knee arthroplasty will be both the patient's pre-existing arthritis, as well as augmented by the infection and the delay in the diagnosis."

Dr. Skolnick does not state how long this "delay in diagnosis" existed. He does not state when the diagnosis "should have been made[."] Dr. Skolnick does not state that there was a deviation from the standard of care.

. . . .

[Plaintiff] has a long history of bilateral knee problems. There was no deviation from the standard of care with regards to the 2/2014 knee surgery, when it was noted that [Plaintiff] would require a total knee replacement. This opinion was based on direct visualization of the articular cartilage of the knee by Dr. Shakir at the time of surgery. Advanced arthritic changes were noted throughout the right knee joint.

There was no deviation from the standard of care with regards to the surgery of 12/2014. Postoperatively, the majority of [Plaintiff's] complaints, if not all of his complaints[,] would normally be associated with knee arthritis and recent surgery. This would include pain, swelling, warmth, and erythema.

On 12/16/2014, blood work was performed. It did return with an elevated white blood cell count. It is unclear how long it took for this result to be sent to the prison. It is unclear if the treating orthopaedist was notified. There are many potential reasons for an elevated white blood cell count. This would include but not be limited to . . . recent surgery, infection at any site, or stress.

When Dr. Miller evaluated [Plaintiff] on 1/2/2015, his clinical acumen indicated that infection was not in his differential diagnosis. His exam indicated an arthritic knee. To help this patient, he injected the right knee with a steroid.

At some point, [Plaintiff] did develop an infection in his knee. It is unclear when this occurred. Hence, it is not possible to state that there was a delay in diagnosis. The development of a postoperative infection is not a deviation from the standard of care. All surgery, and even injections carry with them the potential risk of an infection.

> Within a reasonable degree of medical probability, [Plaintiff's] need for a total knee replacement is completely unrelated to the postoperative knee infection. The treatment of his right knee is completely unrelated to any complaints referable to his left knee.
>
> Within a reasonable degree of medical probability, Dr. Scott Miller did not deviate from the standard of care in his treatment of [Plaintiff]. Within a reasonable degree of medical probability there is certainly not any deliberate indifference to [Plaintiff's] alleged severe medical needs by Dr. Miller.

(ECF No. 117-12 at 8-9.)

## II.    <u>LEGAL STANDARD</u>

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *Id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion.  *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.  However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial."

*Serodio*, 27 F. Supp. 3d at 550.

## III.   DISCUSSION

### A.  Plaintiff's Eighth Amendment medical claims

In their motions for summary judgment, Defendants argue that they are each entitled to summary judgment as to Plaintiff's Eighth Amendment claims, all of which assert that Defendants were deliberately indifferent to Plaintiff's medical needs in relation to the infection he developed following his knee surgery in December 2014.  In order to make out a claim for a defendant's deliberate indifference to his medical needs in violation of the Eighth Amendment, a plaintiff must prove that he had a sufficiently serious medical need and that the defendants engaged in acts or omissions which demonstrate that the defendants were deliberately indifferent to that need.  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).  An act or omission will amount to deliberate indifference where it indicates that the defendant "knows of and disregards an excessive risk to inmate health or safety."  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  An inmate's medical need will in turn be sufficiently serious to support an Eighth Amendment claim where the need "has been diagnosed as requiring treatment or is so obvious that a lay person would easily recognize the necessity of a doctor's attention." M*onmouth Cnty. Corr.*

*Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert denied*, 486 U.S. 1006 (1988).  A defendant may also be held liable where that defendant had "knowledge of the need for medical care [and] . . . intentional[ly] refus[ed] to provide that care."  *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).  In such an instance, the denial of medical care for non-medical reasons resulting in "undue suffering or the threat of tangible residual injury" will be sufficient to make out a claim for relief.  *Id.* at 346-47.

In cases such as this one, where "a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'"  *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n. 2 (3d Cir. 1979)).  Where a prisoner has received treatment, he may generally therefore not show deliberate indifference by asserting only his disagreement or dissatisfaction with the treatment he received.  *See Hairston v. Director Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden Cnty.*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).  Deliberate indifference in this context, however, "requires more than inadequate medical attention or incomplete medical treatment," *see King v. Cnty. of Gloucester*, 302 F. App'x 92, 96 (3d Cir. 2008), and a plaintiff who demonstrates conduct amounting to only negligence or medical malpractice will fail to make out a claim for relief under § 1983.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

In this case, Plaintiff's medical claims are directly related to his contention that his treating physicians missed or misdiagnosed a post-operative knee infection that delayed his treatment and may have exacerbated his arthritis.  Although Plaintiff contends that this misdiagnosis is the result of deliberate indifference on the part of Defendants, he has not marshalled evidence to support this conclusion.  The expert reports submitted in this matter essentially agree that Petitioner's arthritis

and meniscal tear were adequately and properly treated through his December 2014 surgery, and that, when there was some sign of infection in mid-December, Plaintiff was appropriately treated with Bactrim as an antibiotic to stave off infection if one were developing. Indeed, Plaintiff's own expert does not at any time suggest that *any* of the Defendants so much as deviated from an appropriate standard of care at any point between the December and February surgeries – that is, he does not contend or opine even that Defendants' actions amount to medical negligence, let alone deliberate indifference.

Plaintiff's medical history suggests that he was seen multiple times by Dr. Shakir in December, and once by Dr. Miller in early January. When seen by Dr. Shakir, he was provided treatment and antibiotics to the extent he appeared he might have had an early-stage infection. When seen by Dr. Miller, Plaintiff did not exhibit the symptoms of an infection, and Dr. Miller instead concluded that Plaintiff's pain was the result of his arthritis and provided him with a cortisone shot. Plaintiff was not seen by either of these two doctors again until late February, when Dr. Shakir found Plaintiff's joint to be swollen with considerable liquid and recommended his being moved to a hospital for drainage and treatment of an infection, care which was thereafter provided by Dr. Miller. Plaintiff's medical history thus does not indicate that either of the two doctors were deliberately indifferent to an infection – they either treated any infection they encountered, or didn't encounter signs of infection during their few interactions with Plaintiff in December 2014 and January and February of 2015. At most, Plaintiff merely disagrees with the treatment he received because he believes they failed to diagnose an infection he apparently did not appear to have in January 2015[4] – a claim that at worst would amount to medical negligence

---

[4] Although the Court need not get too far into the weeds of when Plaintiff's severe knee infection – the one treated in February 2015 – actually developed, it is in no way clear from the facts submitted that Plaintiff did have an infection when seen by Dr. Miller in early January 2015. Plaintiff's own expert does not estimate or guess when that infection actually developed, and

and is insufficient to support a claim for deliberate indifference to medical needs under the Eighth Amendment. *Rouse*, 182 F.3d at 197; *King*, 302 F. App'x at 96. Both Dr. Miller and Dr. Shakir are therefore entitled to summary judgment as Plaintiff's Eighth Amendment claims against them.

Plaintiff's claim against Ms. Peregmon fares no better. Plaintiff's claim against Ms. Peregmon, his physical therapist, arises out of her performing her duties and providing him with therapy. Specifically, he contends that the therapy was often painful and difficult, and Ms. Peregmon disagreed with his self-diagnosis of an infection. (*See* ECF No. 117-1 at 2.) Even putting aside that Ms. Peregmon was merely providing the physical therapy prescribed by his treating physicians and was not herself a doctor capable of diagnosing him or ordering treatment with antibiotics, Ms. Peregmon disagreed with Plaintiff's self-diagnosis because upon examination she found him to not have a fever, redness, or warmth in the knee area, all of which led her to believe his pain and difficulties were the result of his arthritis, and not an infection. (*See* ECF No. 117-3 at 2-3.) Plaintiff's claims once again fall into the realm of a potential misdiagnosis – which would at worst amount to a species of medical negligence insufficient to support a claim for relief under the Eighth Amendment. *Rouse*, 182 F.3d at 197; *King*, 302 F. App'x at 96. Ms. Peregmon is therefore entitled to summary judgment as to Plaintiff's constitutional deliberate indifference claims.

---

Defendants' experts suggest that the infection treated in February 2015 was in its early stages and likely developed only a matter of days before it was discovered by Dr. Shakir on February 26. The only basis for suggesting that Plaintiff had an infection prior to late February other than the one apparently treated in December 2014 is Plaintiff's own belief. Given that the symptoms that led Plaintiff to that belief – pain and swelling – could both have been caused by his degenerative arthritis and surgery, however, Plaintiff's untrained belief as a layman does not require the Court to infer that he had an infection throughout January and February 2015 in the absence of supporting medical diagnoses or other indicators such as records of fever or the like on Plaintiff's part.

**B. Plaintiff's state law intentional infliction of emotional distress claim[5]**

Defendant Peregmon also argues that she is entitled to judgment as a matter of law as to Plaintiff's state law tort claims for intentional infliction of emotional distress.  In order to make out such a claim under New Jersey law, a plaintiff must show that the defendant acted intentionally; the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"; the defendant's actions proximately caused the plaintiff emotional distress; and that distress was "so severe that no reasonable [person] could be expected to endure it."  *Soliman v. Kushner Co.*, 433 N.J. Super. 153, 177 (App. Div. 2013) (quoting *Segal v. Lynch*, 413 N.J. Super. 171, 191 (App. Div. 2010)).  Plaintiff clearly stated during his deposition that all of his claims against Ms. Peregmon were the result of the pain and suffering he endured as part of the physical therapy she provided him in the face of his complaints of pain, discomfort, and potential infection. (*See* ECF No. 117-1 at 2.)  Those actions – providing a course of prescribed physical therapy in for an individual with a painfully arthritic knee – are not "so outrageous in character" or "extreme in degree" as "to go beyond all possible bounds of decency," and thus do not qualify as the sort of outrageous conduct required to state a plausible claim for relief for intentional infliction of emotional distress.  *Soliman*, 433 N.J. Super. at 177.  Defendant Peregmon is therefore entitled to summary judgment as to that claim as well.

---

[5]  While Defendant Peregmon moves for summary judgment as to the intentional infliction of emotional distress claim, Defendants Shakir and Miller fail to directly argue they are entitled to summary judgment as to Plaintiff's emotional distress claim.  As Defendants Miller and Shakir did not provide specific argument as to the emotional distress claim and instead mention it at most in passing, Plaintiff's intentional emotional distress claim against them is not at issue in this opinion, and those claims shall remain pending against those two doctors.  To the extent they wish to do so, Defendants Miller and Shakir are free to move for summary judgment on Plaintiff's intentional infliction of emotional distress claims within thirty days.

IV.     **CONCLUSION**

In conclusion, Defendants motions (ECF Nos. 116-19) are **GRANTED**, and judgment shall be entered in favor of all three moving Defendants as to Plaintiff's Eighth Amendment medical claims, and in favor of Defendant Peregmon as to Plaintiff's intentional infliction of emotional distress claim.  An appropriate order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE